Our first case this morning is FUTURELOGIC v. NANOPTIX. Mr. Williamson. Good morning, your honors. May it please the court, Brett Williamson on behalf of the appellant, the plaintiff in this case, FUTURELOGIC. In order for my client to succeed on this appeal, I need to convince you of two things this morning. First, that the experimental use negation of the Section 102B on sale bar is still available to a patentee even after reduction to practice of the invention. And second, I need to convince you that there were genuine issues of material fact that should have precluded summary judgment being granted. Mr. Williamson, how many printers did Koch send back? Was it two or three? I wasn't clear on that. I believe it was two. On the first point, we believe that an absolute rule that no experimental use can exist after reduction to practice is fundamentally inconsistent with the rule announced by the Supreme Court You have a proposal summary in the record which says, quote, What is proposed is a true product price. These, it says, have been no emissions, which can lead to product upcharges after the award of the contract. Seems like a big problem to me. It was $850. Koch kept those printers, except for the two that were sent back. And those two, it appears in the record, weren't working. Koch seems to have done all the testing, controlled the environment. Where's your experimental? Your Honor, I'll take those in order. First, I believe that the evidence is actually undisputed that the pricing and remember this transaction was initiated by Koch, consistent with a factor that this court has found in favor of experimentation in other cases. Koch required that the pricing be done at least in the format of a product pricing. But the testimony of the inventor, which is unrebutted, was that it was an R&D pricing consistent again with the Monin case, which I think is... R&D pricing, but no upcharges after the award of the contract. Is that right? I believe that would be true if there had been a commercial contract. In Monin, for instance, the evidence in the record there was that the parties had discussed and in fact consummated commercial sales of the trailer after the one year experimental use. And then in that case, even under those facts, it was found that it was primarily experimental. On the second question, again, I think Monin is directly on point here. It's very important to look at what the context of use is. In Monin, the patentee was a manufacturer of tractor trailers, didn't operate them and therefore this court found that you had to contract with, in some manner, an end user of that product and that's what happened. Here, the very same thing... What was inside that so-called testing environment? In our case? Yes, in your case. In our case, these printers are thermal printers. They're made to be put into larger devices, gas pumps, slot machines. What was in there? It was... In the Coca-Cola? It was a printer. It was a prototype printer placed behind a locked door within a vending machine. It was hooked into two separate processors, which is part of claim one of the patent. One of which came directly from the machine for purposes of showing what transaction had happened at the machine and the other to a promotional controller that was essentially irrelevant to what was being vended. In that case, these machines, like a slot machine, like a gas pump, for their ultimate use, they would need to be placed in the field. Coke placed them in the field. How did your client know that since it didn't control that black box that Coke was putting those into? Actually, the record is clear that FutureLogic's representative assisted in the installation of the hardware, downloaded the firmware, trained Coke personnel into how to operate the printers, got regular reports back, got printers back, needed to make fixes to the software during the process. Ultimately, two were returned, but during the course of the experimentation, and the emails are in the record... How many more? It was software and not the actual printers, but the software is what controls the printer and the operations under the claims of the patent. The patent has claims directing what the hardware does. Mr. Williamson, can there ever be a reduction to practice prior to a determination that the invention is suited for its intended purpose? I would say under this court's law, no, but I would say that FAF talks about perfection, and I believe the two-part FAF rule is inconsistent with saying that in no case can experimental use negation be available after reduction to practice. But your answer to my question is that there cannot be a reduction to practice until there's been a determination that the invention is suited for its intended purpose. I think that's consistent with this court's law on reduction to practice. I would agree with you. I agree that that is an accurate statement of this court's law looking at reduction to practice standing alone. Well, then what's left to experiment after that? That is what FAF talks about. FAF said there is a public policy in perfecting the invention in a way that benefits the public, and that is the decision that the Supreme Court made in making that test. Perfecting the invention? That's the language used in FAF. But we've said very often there's a distinction between experimenting on the claimed features and experimenting on the market presentation of that, the monetizing aspect of any invention. Is that the problem here? You're trying to make a product, but you finish the invention? I don't believe that's a problem here. I believe our case is exactly like Monin on that point and EZDoc. In both cases, this court reviewed that very argument by the defendant and appellee that they were simply testing the suitability of the invention in its environment. In fact, I believe it expressly stated in EZDoc that this is another way to test the invention, not necessarily directed to any particular claim. Here, in fact, the record shows that there were claims that were being tested. Is there a claimed feature you were perfecting or experimenting on? In particular, yes. What are they? The ability of the machine controller, the vending machine, to accurately communicate to that printhead. At the same time, there was a second communication stream coming from an external source. Did your client articulate that as a test parameter at any point? At the beginning of the test protocol, in fact, my client did, and listed in the testing form according to the unrebutted declaration that these are the elements that needed to be repetitively tested in an environment in which these are in a machine, like they would be ultimately, rather than standing alone, and in this case, a vending machine, and being repetitively used. Is that in the appendix, and if so, can you give me a cite? The form, I do not believe the form was ever found, but the declaration… Well, that makes me feel better because I couldn't find one. And again, these were events of about a dozen years before, so there are some documents that presumably based upon the unrebutted declaration testimony existed at one time and no longer exist. But that is in the record, and again, it was unrebutted. And on control, and I think that's the key issue because that's what the district court focused on. The district court, for some reason, decided to seize upon a couple of cases from this court where control was deemed to be dispositive, but this was the wrong case to use those precedents because in this case, you cannot test the invention in a way it was supposed to be used without bringing in another party, and that's exactly what happened in Monmouth. Mr. Williamson, when you say that that written testimony about the testing parameters was unrebutted, didn't the other side generally attack the ability to perceive and recollect of that witness across the board? They did, and this is a summary judgment case in which those issues should have been left for the jury to determine. The standard is genuine issue of material fact, genuine issue. And respectfully, Your Honor, I believe there are numerous cases that show that if the dispute of fact is telling the district court, don't trust this recollection, that is the classic example of a genuine dispute that the district court judge should not resolve in favor of the moving party. That is why we have a rule that says all reasonable inferences and indulgences should be found in favor of the non-moving party. So on that point, to the extent the district court judge credited that, then I believe the district judge was in error. If there are no more questions on this point, I'll reserve the remainder of my time for rebuttal. Thank you, Mr. Williamson. Mr. Rounds, you're going to split this into two? Yes, we are, Your Honor. I'll be handling the rebuttal to the appeal arguments on on sale, and Mr. Yow from my firm will be handling the cross appeal. I haven't heard anything on... Inequitable conduct. I haven't heard anything on inequitable conduct yet, but we'll proceed. Thank you, Mr. Williams. Thank you, Mr. Williams. May it please the court, I'm Michael Rounds. I represent the appellee in the cross appellant synoptics. There's three dispositive facts in this case that absolutely are dispositive of the on sale bar under 102B. The critical date in this case is March 29th of 2001. It's undisputed that Future Logic sold 24 printers for $850 apiece to Coca-Cola in April of 2000, number one. Number two, it's undisputed that each and all of those units were the claimed invention. Of course, a sale is not inconsistent with experimentation. We've had the case that comes to mind is the court permitting the sale of highway lamps that were under experimentation in Wyoming, and we acknowledge that you can have a sale consistent with an ongoing experimentation. The primary purpose... as to whether or not this sale was consistent with the experimental purpose, right? Well, let me get to what is dispositive. And that would then propel us past summary judgment, and you'd have a little problem. So that one is out. Let's go to your second one. This is my third point, and this is where Mr. Williams began. The reduction of practice of the claimed invention occurred no later than January 28th of 1998. Two years before the activity we're talking about, the sales activity. The law is so clear in the Federal Circuit that you cannot have experimental use after reduction of practice. Judge Lynn, it was in the EZDoc concurrence. There's at least 10 Federal Circuit cases that make that finding. The EZDoc majority... Did not address that issue. The EZDoc majority was very clear that when you're testing something in its intended environment, experimentation is very acceptable. How would you test this invention except by putting it into commercial vending machines? And how would you do that without letting it work for an extended period of time to see if it works in its intended environment? Well, let me answer that in two ways. The first is the definition of reduction of practice is showing that the invention will work for its intended purpose. There is no question... Yes, but we can do that in a laboratory very quickly, and it works right there in the laboratory. But notice that there is a disconnect between reduction to practice law and experimental use law, because we allow the experimentation to extend to testing it in its intended environment, not just in the laboratory. Address that. Well, I will, Your Honor, but... So you've got it in the laboratory, fine. You've got reduction to practice, but you have not tested it until you've put it in a Coke vending machine for two years to see how it stands up. Well, that's testing for commercial purposes, and that is not experimental use. And again, we have to... No, no, that would be a question of fact, wouldn't it, whether they're testing it for marketing and commercialization or they're testing it to see if the claimed features are going to actually work over an extended period of time in hot climates, in cold climates, in big machines, in little machines, in soft drink machines, in donut machines. Do we have donut machines? We need them. Go ahead. Well, not in this case, Your Honor, because as Mr. Williamson was addressing the issue of control, the bottom line under the case law is that the inventor has to be involved and has to control the testing, and that absolutely was not met. In this case, the inventor... Well, now you're shifting grounds again, though. I want you to stick with the disconnect between reduction-to-practice rules and experimentation rules, where we allow a broader stretch for reduction-to-practice when it's applied in the experimental area. I guess the question is that if, in fact, there is experimentation, that experimentation can be used to determine whether there's reduction-to-practice, but that's the problem that the appellant has in this case. No, but see, of course, the problem you have is that everything we're talking about is incredibly factual. Is this a commercial experimentation? Not allowed. Or is it a technology experimentation in its intended environment, which happens to have a commercial component? That is allowed. Well, it's all factual. How do you get by the facts here? Again, the law requires that the sale be primarily for purposes of experimentation. That's factual, isn't it? You're going to have to have witnesses saying this was 60% in the environment for 60% purely commercial. Well, there is no dispute of material fact on that issue in the record below, and that was where the district court was absolutely right, because the control, again, the control of the testing was all Coca-Cola. And when you have a fact pattern like that... Okay, you're going to shift this over to control again, but they were getting reports back. Why isn't that report back adequate control? Well, again, because it was Coca-Cola who was providing reports to FutureLogic. FutureLogic at that point would make a few changes to the units if appropriate. There was only a couple units that that occurred with, but the bottom line is... That sounds to me like adjustment after experimentation. Absolutely. It sounds like you've just given us a fact that the trial court overlooked. No, absolutely not, Your Honor. Again, you have to focus on who was conducting the experiments. The law requires that if, in fact, there's going to be experimentation, that it has to be done by the inventor or controlled by the inventor, and that is what's missing from the record for the appellant in this case. Back to my streetlights in the Wyoming desert. Who did the monitoring there? It was the state of Wyoming. The state of Wyoming forwarded it back to the inventor. Same situation here. How do you get around that case? Well, again, I would say in that case it was very clear that the inventor was substantively involved in the testing, even though the testing was conducted by a third party. That fact is absent. If you read the inventor's testimony in this case, he absolutely testified that when those units were shipped to Coca-Cola, he had nothing to do with the testing. No, no, they're Coke's machines, obviously. You're not going to be able to tell Coke what to do with its machines, and Coke's the thousand-pound gorilla here. So isn't this the best you could do is to get a report back with an ability to correct things as the experimentation required, which is exactly what happened? And once again, isn't all this factual? No, Your Honor. Again, I think the bottom line from the facts that we have here is that Coca-Cola was doing commercial testing because they wanted to put these units in the field. That's what the facts show in this case. The involvement of Future Logic was peripheral. They corrected a few units. They were not involved in the testing whatsoever. I'm out of time. Mr. Rounds, before you sit down very briefly, am I correct that there was an admission or a stipulation that the printers in question here were reduced to practice? Yes, that's correct. Was there any indication in that? Was it a stipulation or an admission? The way this came about, it was an admission. It was a response to an interrogatory. Okay, so it was an admission. Was there any characterization of that admission as being a reduction to practice in a laboratory sense and not in a real world sense? Absolutely not. Thank you. Good morning, Your Honors. Adam Yeltsin, Watson, Rounds for the Cross Appellant and Optics. The issue of inequitable conduct was properly before the lower court, although ultimately reaching the wrong result. Materiality in this case is established as a matter of law under Theracense on at least three different grounds. Number one, it's established because it's an unmistakably false affidavit. Number two, it's established because... Couldn't the district court have read that affidavit and said, yeah, the stuff in here clearly has errors, but it's 12 years past. It's not intentional. He could have, Your Honor. He exercised his discretion in denying this, didn't he? Well, Your Honor, you're correct that the district court does have discretion and his findings of no intent, no materiality are reviewed for clear error. But as Judge Rader said, and I believe it's Aventis v. Amphisar, the standard's high, but it's not insurmountable. And I think it's surmounted here. So it's not just mistakes, Your Honor. There is just a systematic progression of hiding things, and it's actually exactly what Judge Lynn said when he was describing the recent case, Aventis v. Hespera, which is that there's a careful and selective manipulation of where, when, and how much of the most material information to disclose. Let me see, first of all, I may have written that opinion, but I was speaking for the court, the same for Chief Judge Rader. So you're mischaracterizing, and I don't know whether you're doing this to pander to the court or what, but that doesn't score points for you. It's the court's opinion, and you can go ahead and cite it. Actually, Your Honor, I apologize if I was unclear, but in both cases there were some occurrences. I stand corrected. Anyways, Your Honor, my point is that there is substantial evidence of intent here. I wouldn't disagree with you if I was reading it cold, but the district court's reading it, and so we're reviewing him for abuse. Yes, Your Honor, and I think that the instances where that is going to be met are rare, and Your Honor is correct to have every instance of hesitation at questioning the district court's discretion. But I think if the case is going to meet it, it's got to be something like this. If you look even at the first two declarations that Mr. Meyerhofer submitted, they were incredibly detailed. They had significant exhibits. They redacted the date and only the date on those exhibits, and then when you get to the examiner's rejection, where there's a final rejection on 102B, and he specifically asked all the questions you ask on 102B. Was it offered for sale? Was it publicly used? Where's the NDA? But you just heard me discussing with your colleague that there's an awful lot of factual component. Every aspect of the on-sale bar, the experimental use exception, couldn't all of that have been part of the lack of intent here? They thought they were doing right. In fact, they still think they're doing something that was an experiment. Well, Your Honor, if it's exactly as Mr. Williams said, we've been talking about the second issue. So where is the intent going to be, is my point, if they still think they've got an experimental use negation? The intent comes in the first thing that Mr. Williams said he has to convince you of, and that's that experimental use is still available, and it's not. There's been reduction to practice. I just went over with your colleague, there's a big disconnect between laboratory reduction to practice and reduction to practice in its intended environment. I don't think there's really a disconnect, because if you look at what happens in Monon, and you look at what happens in EZ-DOC, and you look at what happens in SealFlex, it's very consistent that the doctrine that's been used is an inherent claim limitation of durability. So really what you're saying is if you haven't shown durability and there's an inherent limitation of durability, then you haven't reduced to practice. Reduction to practice carries benefits under the currently existing first-to-invent rule, and you shouldn't be allowed to claim reduction to practice in one sense to get those benefits, and then turn around and say, well, there's some other things that aren't really claimed that we need to test. Well, the point is, how are they going to have a malicious intent here, an intent to deceive, if there's so much law and factual uncertainty that can be clouding any finding of intent? You may answer. I think number one is that they just didn't say anything. And if you look at what they did before, they knew that they had to provide details, they had to provide facts, they had to provide documents. And when it came time for 102B, where they know as a matter of law that experimental use is not available, it's in the NPEP, it was cited by the examiner, the specific section of the NPEP that says experimental use is not available. When you look at those things, that's an intent to withhold things. And that's what you have to do. You have to know it was material, and you have to intentionally withhold it. And they did that. All right. Thank you. Thank you, Your Honors. Thank you, Your Honor. With respect to the 131 declaration, Mr. Meyerhofer's declaration, on its face, did exactly what the examiner requested. That is, you have given us a prior declaration explaining that there was some use of this invention. You need to give us more facts about whether or not this was experimental use or commercial use. And that's exactly what that final declaration did. Mr. Meyerhofer said that FutureLogic and Coke were bound by a mutual nondisclosure agreement. He did say that. And, in fact, that's what Mr. Meyerhofer to this day believes. Even though there actually wasn't any written agreement, the testimony from the Coca-Cola representative was that there was some kind of informal understanding. Correct. Okay. Mr. Meyerhofer said that none of the prototype promotional printers were sold. He did say that, but the context was that he did acknowledge that monies were exchanged and given to FutureLogic from Coke for purposes of the development, which, again, Mr. Meyerhofer will tell you today he believes to be the case. He said that the printers installed in the vending machines weren't accessible by the public. That is absolutely true. But the vending machines were right there in the public. That is true, but it's undisputed fact that the printers themselves, all you can see in one of these is a small slot where the paper comes out. It's locked. Not even the person who puts the sodas in the machine can see the printer. I can see how the court denied their motion, but I can also see why they're saying that what Mr. Meyerhofer said wasn't true. And I understand that, but I believe that that requires us to take Mr. Meyerhofer's state of mind, an intent that's absolutely critical, as this court knows, and fast-forward it to a time beyond this hearing, and that's just impermissible. He could have forgotten. He could have forgotten or he could have had a good faith basis in believing that the Supreme Court's decision in FAF was dispositive, and he had every opportunity to argue that an experimental use should negate the 102B bar that the examiner was raising. We're talking about the facts. Understood. But the examiner taking the facts, which, again, if you look at them now are all consistent. At best, this is a claim of an omission of detail and not as to the accuracy of the facts stated in that declaration. You heard me discuss with Mr. Rounds that reduction to practice may have a broader meaning in the context of experimental use, allowing you to test it in its intended environment, but you didn't say that in your stipulation, did you? You just said we've reduced it to practice, period. How do we deal with that aspect of this case? I think there's something of a misconnect because the admission in the interrogatory response during the district court proceedings was relating to a different prototype, and that prototype was only relevant to claims which apparently had been abandoned that there was a commercial offer to sale much earlier. It's not inconsistent to say that for purposes of the prototypes that were built for a potential commercialization at some point down the road, if the testing proved that environment would work, had not been done. Wasn't that earlier prototype the same as the product in question with respect to the claimed features? With respect to the specific claimed features, yes. Didn't you have to lay this out in that interrogatory if you wanted to rely on it here? I'm not sure I understand the court's question. You make it kind of across the board statement, reduced to practice. Don't you have to say, as to this prototype, other things were not? Don't you have to somehow give an indication of the argument you're making now? Why can't they just rely on your reduction to practice? Doesn't the court rely on your reduction to practice admission? In fact, the interrogatory response did exactly as you state. It was very detailed in talking about the various times at which the prototypes were developed. I'm not even sure the interrogatory response is in the record on this appeal. If I understand your question correctly, the plaintiff, in this case, did in its interrogatory response exactly as the court imagined it should. That's not in the record? It may be. I don't believe it's ever been talked about in the briefing. I believe the reduction to practice point was talked about in terms of the 131 declaration. I have nothing further unless there are questions. Thank you, Mr. Williamson. Mr. Yall. Your Honor, the interrogatory response is in the record. It's 269 to 270. What is it? 269 to 270. It might be a page more or less. I couldn't quite see exactly where it started and ended, but it's in that area. Beyond that, Your Honors, Mr. Marhoffer was responding to a specific targeted laser from the patent office with a 102B final rejection, and he didn't give them anything that they need to know. Paragon says that, especially in cases of 102B issues, that it's even more important that you give them all the facts. The interrogatory response we're talking about is at page 8270 where it says the invention of the 855 patent was conceived by September 3, 1997, and was reduced to practice by January 21, 1998. Is that correct? Yes, Your Honor. It was supplemented as well. There's a previous response, but that's the most specific and the latest response. Did the supplement condition it in any way or modify it? No, Your Honor. Your Honor read from the supplement. I was just stating that there was an earlier response to that, and what you read from was the actual supplement, and it was the latest such supplement. I see. That's there. The other thing, Your Honor, is that Mr. Meyerhofer's previous two declarations said that the reduction of practice was of the Koch unit. I mean, it's invention reduced to practice, not an embodiment, not a specific product, so the Tokheim or Koch, it's kind of irrelevant, but the point is that this is what they used, and this is what they told the patent office, and this is what they're stuck with. If there's no further questions. Thank you, Mr. Yell. Thank you. Our next case is in.